LLC v. Thermotek, Incorporated Let's wait and let everyone get set here. Okay, Mr. Spaulding. Thank you, Your Honors. May it please the Court, my name is Thad Spaulding. I'm here on behalf of the appellant Thermotek, Inc. and Mr. McSpadden, its CEO, who's here with me today. This case presents a number of significant issues. It is, once again, presents this Court with a preemption argument under copyright in the Patent Act. It also presents a waiver argument with regard to that preemption defense and whether that defense was actually preserved. It also presents an issue of legal sufficiency of lost profit or damages for unfair competition and fraud. What this case does not present is any dispute as to Mr. Wilford and one other entity's liability for fraud and unfair competition. There's been no dispute. The jury found that he committed fraud. The jury found that he engaged in unfair competition. Those findings were never challenged, so those stand. Where the unfair competition claim was set aside was based on a preemption argument that was never pled. It was never pled in the initial response of pleading. There was never any request by the defendants to amend their pleading at any point, not before trial, not during trial, not after trial. The problem here and where the preemption issue was still given merit or still given consideration was because of the exception that, frankly, has seemed to, at least in this case and maybe other cases, but in this case has seemed to swallow the general rule, the under Rule 8 that an affirmative defense needs to be pled. It was raised, as I understand it, before discovery was closed and, as it turned out, two years before trial. Is that right? It was mentioned. I would argue that it was not substantively raised. There was never any motion for summary judgment on the preemption argument. And, in fact, there was a motion for summary judgment on the unfair competition claim that did not mention preemption. The first time it's raised is in two footnotes in a reply brief in support of the motion for summary judgment. And in those footnotes, all that's cited is the Benito Boats case, which is a patent preemption case, the argument being that to the extent we're relying on public information as part of our unfair competition claim, those claims would be brought up. Just the argument that you've made it in briefs and now again here, but aren't we foreclosed from sort of considering it with Allied Chemical? Aren't we already down the path of pragmatism and prejudice? A district court can overlook it if it makes the finding, and if you candidly conceded to Judge Fitzwater, is that it? Yes. That there wasn't prejudice to you, you had time ahead. Aren't we already in that boat with Allied Chemical? I mean, I think that Allied Chemical, I mean, it certainly, that's within, you know, if it's raised at a pragmatically sufficient time. And so then if he makes the fact findings, that sort of cabins our review, even if now in hindsight you're pointing out other circuits are maybe saying this is swallowing a rule and there are bigger issues at play. We had that rule, that formula, and he applied it factually. I think as far as the pragmatically sufficient time is concerned, that is probably true. But before you get there, there needs to be an analysis. And, of course, in the Harris case, we saw it out of the D.C. circuit. It presents that analysis. But that's a court that was considering it in the first instance. That's correct. But we've already got Allied Chemical. Yes. Okay. But the ñ and I'm not conceding the pragmatically sufficient time. I think, and I think we've argued that the court abused its discretion in finding that it was raised as a pragmatically sufficient time. But before you get there, and I think it still is part of the overall consideration, there's got to be some acknowledgment of the pleading scheme that exists under the federal rules. Yeah. And those were ñ and that was simply never followed here. In fact, the first time it was actually ñ it was raised ñ and just say we're prejudiced. Did you make the argument to the district court you're making to us? When it was raised ñ It's frontally presented in the motion to reconsider, right? At that point, it's squarely in front of everybody. And if I remember, the district court said, you know, this is going to be better. Let's consider it a trial, essentially. And are you prejudiced? And there was some record evidence that counsel said we can't really point out how we're prejudiced. So it does seem that he could say let's move it forward and see if these items really are covered by copyright and patent or not. Well, but that aspect of it was never on the table because it was never substantively raised until we had rested our case. That was the first time it was brought up. And even at that point, we were not asked to substantively respond to the issue. Like I said, it was raised first in a footnote to reply brief. Then it was mentioned in a motion to reconsider. If we get past it and now we have the benefit of the whole trial, what items are not within the subject matter of copyright and patent? Can you give a record cite to something that doesn't fall within? Sure. When we get to trial, there is more than just articles that are reduced to writing or the physical product. Give me your best example of an item that's more than reduced to physical item. The distribution system. An essential part of this product was how you get paid for it. Part of what Thermotech had done in producing the product, and the product wasn't just housed within the four walls of the actual machine or the wrap itself, but you had to get FDA approval for this product, and then you had to sell it to the doctors because the doctors only prescribe these machines. They're only available with a prescription. So Thermotech had to develop the relationships with the doctors. They had to develop the pricing structure. They had to get codes that would allow you to charge insurance for these products. At the time Thermotech developed this product, there were no codes that addressed this deep vein thrombosis treatment with these sort of machines and with these sort of wraps. And so in the process, they put together this distribution system that included the pricing and the coding and all that sort of stuff that would not fall within the scope of copyright or patent protection. In addition to that, throughout the course of their relationship with Mr. Wilford, Mr. Wilford was manufacturing problems with our product. He was returning the product under the guise of, hey, these are defective. We've got some problems with these. He would send them back, and then he would offer to sort of be part of the process in determining where the problems were. And the argument at trial, which the jury believed because they found in our favor, the argument at trial was he was doing this as just a ruse in order to get more information about these products so that then he could go out and manufacture his own, which is exactly what he was doing. But what he ended up doing was he ended up coming into our facility, got meetings with the engineers, and was able to see exactly how we were doing. That is information that he got that is not subject to Copyright Act or the Patent Act. That's information that he's getting through direct interaction with our engineers, with the people who are actually designing the product, and is information that he wouldn't have access to otherwise. So there's information that exists beyond the Copyright Act and the Patent Act that would be subsumed within this. Now, throughout the trial, preemption is not an issue. So there's no reason at that point for us to distinguish between the physical product or things that are reduced to writing. Just as an aside, I don't concede that anything that is reduced or that everything that is reduced to writing is necessarily within the scope of the Copyright Act because the Copyright Act differentiates utilitarian designs. There's got to be some artistic component to at least the graphic drawings or pictorial drawings that they argue. In fact, a panel of this court recognized that distinction, although it ended up throwing everything into copyright preemption, but it recognized that useful articles or utilitarian articles fall outside of the scope of Copyright Act protection. But you do agree, don't you, that copyright preemption is broader than the scope of copyright protection? Well, that depends on whether we're talking about complete preemption versus ordinary preemption. And I've gone around and around with this based on the Globe Ranger cases and the Spear marketing cases, but the latest Spear marketing case, the one that came out just last year, makes a good distinction between complete preemption and ordinary preemption and says that complete preemption is a jurisdictional issue. Complete preemption is sweeping. And so anything that falls within the scope, and the scope under complete preemption principles is broad, anything that falls within the scope, the federal court has jurisdiction. So that if we're talking about removal or even original jurisdiction, then those claims, state law claims, even if they deal with a product that may be exempt from copyright protection but falls within the scope, the federal court has jurisdiction to hear those claims. But that's different from ordinary preemption. Ordinary preemption is the affirmative defense. Ordinary preemption is, is this a defense to the merits of the claim? And so Spear marketing draws a distinction. Now, UltraFlow that came out just at the beginning of this year, and I think UltraFlow is distinguishable in that UltraFlow had a claim for copyright infringement. And so if you've got a claim for copyright infringement, I think it's difficult to argue that your claims fall outside of the scope of copyright infringement. So UltraFlow dismissed the claims on their merits. But you might well have a strong copyright infringement claim here. There's possible, it's possible that some items would, but not all items do. The item you said now today, it's a little clearer to me, would be these mental impressions that he developed that were never reduced to writing. Right. Cost. Okay, do you have any particular record site where those were discussed in the trial? I'm thinking the coding and the pricing, I would think that would naturally get reduced to writing. At some point, yeah. What's your best case that this mental impression orbit is outside of the copyright act? What case draws that distinction? I think if you look at the two Globe Ranger cases, those cases draw the distinction. Now, the first Globe Ranger case dealt with business processes and customer lists, those kind of things that in Globe Ranger 1 and 2, and I think even in Spear Marketing 2. Didn't Globe Ranger 2, it was a trade secrets case which gets us into the world of the extra element and wrongdoing. Well, by Globe Ranger 2, the claims had been reduced. There was not as, the scope of the unfair competition or the misappropriation claim had been knocked down to misappropriation of software, which everybody acknowledged fell within the scope of copyright protection. But Spear Marketing acknowledges that the claims as they originally existed in Globe Marketing were much broader than that and that those claims would have fallen outside of the scope of the protection and presumably not be preempted. So it's kind of a big circle back to what we would have done or what could have been done differently. You could have distinguished all of these different items for purposes of the charge in determining what aspects were addressed and what aspects were subject to the unfair competition claim and what aspects weren't so the jury could break those down. Now, they submitted, and I see I'm out of time, and I can pick it back up. Well, you haven't had an opportunity to discuss the net profits issue, so I'm going to give you two extra minutes. You can still have all your rebuttal time if you'd like to touch on net profits, but limit it to two minutes. Sure. The net profits is we proved net profits, and the way we proved that is using the gross profit margin. Now, the— Well, so you accounted for the cost of goods sold, but you didn't account for ordinary business expenses, did you? Well, we're just talking about one product line. I mean, Thermotech sells other products other than just the product that was issued here in these particular wraps. So those fixed expenses, those normal business expenses, those are when you're talking about the entire business, the profits of the entire business. When you're talking about just a particular product line, then that's when the gross profit margin is the proper way to look at this. So you don't have to allocate general business expenses then if you're only talking about one product line? Right, because it takes it—because the gross profit margin takes into account the cost associated with just those goods. If it's an ongoing business and you've got other products that are being sold, then you're taking care of your fixed expenses, your rent, your overhead, all that kind of stuff with the rest of the business. If you're looking at the profits lost just on a particular product line, just with regard to that particular product line, then the gross profit margin takes care of that. And, in fact, that's why our expert used the gross profit margin, because when looking at what Mr. Wilford and his entity's profit margin was, it took into account the entire business versus just that particular product line. All right. Thank you, Mr. Spaulding. Thank you. You've saved your full five minutes for rebuttal. Mr. DePreeter. Good morning, Your Honors. I please the Court. My name is Matthew DePreeter, and with me is Michael Cook. I'll be addressing the issues of waiver and preemption. Mr. Cook will be addressing the damages and lost profits issues. I'd like to start with the issues of waiver, and Your Honor actually pointedly hit the nail on the head when it came to what's at issue here. The district court had to determine whether or not we raised our affirmative defenses in a pragmatically sufficient time. The district court determined that we hadn't sufficiently raised it in our answer, and so it went to the fallback under 8C and said, well, in the Fifth Circuit, the way we do things is you look to see has this defense been raised at a pragmatically sufficient time, such that there is no unfair prejudice to the opposing party. And it looked at the facts of the case and said, well, you raised it during the summary judgment phase. You raised it specifically on this motion to reconsideration. And at that time, the district court said, well, let's hold off on that. Let's wait until the trial. You can raise it by post-trial motion at J-Mall. And so we followed the district court's instructions. Discovery went on for another year. Trial wouldn't happen for another two years. And when we got to trial, we raised preemption specifically in the pretrial order. And we went through trial. At the close of Thermotex's case, we raised preemption again. And we raised it at the close of our case. We raised it during the post-trial motion on J-Mall, just as the district court had instructed. And then we got to oral argument on that issue. And we raised it again. We discussed it with the district court. And at that time, the district court asked Thermotex point blank, how were you prejudiced? For example, what would you have done differently in trial? Is it accurate, as Mr. Spalding represented, that it was first mentioned in a footnote in the reply brief on summary judgment? That is accurate, yes. That's the first time it was specifically raised. Now, during our answer, we said that Thermotex asserted claims that couldn't be decided under 12e6 because, well, under 12e6. Then when we got to summary judgment and Thermotex had pared down a number of its claims, we specifically said this is preempted. The way that they're trying to apply this unfair competition law is preempted. And we raised it specifically through that motion for reconsideration. And that's the time when the district court said, let's hold off. Let's look at their evidence and see what they have. Let's deal with that post-trial. And that's what we did. And Thermotex said on the JML hearing, how are you prejudiced? And their answer was, quote, I don't know. Practically speaking, I don't think we would have done anything differently at trial. So it was established at that point that there was no prejudice. The district court exercised its discretion in allowing the defense to move forward, deciding that issue, and that's how we ended up dismissing or ruling on preemption. So this court is really only looking at whether you've used discretion in doing that, and he didn't. Would you agree other courts seem to be looking a little deeper into the Rule 8 problem and whether there's a burden shifting here, they've got to show prejudice, but if you'd complied with Rule 8? I would agree that one other court, the district court, or the, excuse me, the D.C. Circuit Court, has applied a little bit different framework. But that's one case from 20 years ago that's never been followed in this circuit, and this circuit has consistently followed pragmatically sufficient time, along with a number of other circuits. I think we cited that case of Ahmaud V. Furlong out of the 10th Circuit, which cites cases from the 1st, 2nd, 3rd, 4th, 5th, 6th, 8th, 9th, 11th, that all follow that pragmatically sufficient time standard, which is what we followed here. So moving past it, what about the latest, the argument they're trying to say, there were items here that aren't copyright protected? And I think, Ted, again, you've hit on something there. This is the latest argument. This is brand new. This is the first time that they've raised it. You'll check back in their briefs. They've never cited anything that wasn't subject to copyright or patent protection. We listed out all of their evidence. We listed that out on JMAL. They didn't dispute it there. We listed it out. It's, you know, the drawings, CTQs, user manual, FDA documents, things like that. The machine, the wraps. We listed all that evidence out in our brief on JMAL. They didn't dispute any of it there. And to come in today and say, well, there might be some other stuff, we're not exactly sure what it is, we don't have a certain site in the record, but there might be some things in there, there really just isn't sufficient evidence to substantiate a ruling. And, in fact, I find it a little bit ironic that counsel here said, well, what we could have done is had a more particularized jury charge. Because in this case, we specifically sought a particularized jury charge. In fact, we went back and forth at the district court and said, we should list out what is their evidence. And Mr. Cook was actually arguing this point, and it's misquoted by counsel in their JMAL briefs, or excuse me, their appellate briefs, which is there may be instances where a party says, this is evidence that might be preempted, and there may be instances where someone argues that something is not subject to preemption. And that's why we want to have the specific list. In case someone argues at a later date that something, some stuff, was not subject to preemption. And then, of course, here we are today. Thermo Tech rejected the idea of listing out their evidence. They refused to have that kind of jury instruction. And here we are today with all of a sudden now some stuff. So. What's your strongest preemption case? The Spearmarketing and UltraFloat case is our strongest case. The second one? UltraFloat. UltraFloat. And I think with that, I'm running low on time. Mr. Cook will address the damages. Okay. Thank you, Mr. Grader. Mr. Cook? Good morning. As far as the damages go, it's difficult to imagine a case where there are more obstacles after obstacle after obstacle with their damages theory. They effectively went to trial on a cause of action that didn't match any particular cognizable damage theory that they put on. So let me go through each cause of action in order, if that's okay. We'll start off with unfair competition. First of all, unfair competition was a big problem from a procedural standpoint. For the entirety of the case, they said that they wanted to seek disgorgement of damages. In fact, in a hearing, their lawyer stood up and said, Judge, I've got to have this kind of discovery because I'm seeking disgorgement. If you look at their damages report, it says we need disgorgement. They get to trial. Things change. Oh, no, we don't really mean disgorgement. We mean something different because they realized they had a problem with disgorgement. It's not a cognizable recovery for common law misappropriation. So they said, we abandoned, basically, the disgorgement theory. We're doing something else. So now all of a sudden they're at trial when the entire case, their expert reports, the discovery has been disgorgement, and they say, we abandoned it. We want to do something else. You could stop the analysis there and kill this case. But let's go substantively. From a substantive standpoint, what they want to say is, well, they're entitled to some sort of unjust enrichment. That is, think of what they're doing. They're trying to say that they would have had profits, Thermotech would have had profits from companies other than ours. We'll get to that in just a second. Companies other than ours. And we want to take our clients' profits and use that as a measure of their profits. First time we've heard this at trial. That's their theory. The problem is that the law does not allow that. Now, it's important that you consider what the cause of action is, what it's designed to protect and prevent, and then look to see what measure is connected to that. They have no case whatsoever. They have no what? To support an unjust enrichment measure of recovery for common law misappropriation. It doesn't exist. They cite to nothing on that. Okay? Nothing. So let's talk about what type of measure would be recoverable or appropriate. Well, you look to what the cause of action is designed to protect. In unfair competition, this very narrow thing, we're not talking about trade secret misappropriation. We're talking about common law misappropriation. It's designed to protect the product, not the information. And the courts have said, well, what happens is if somehow someone uses a product and because of the time and money the plaintiff has put into developing it, then the defendant may get some sort of sweat equity, take advantage of the sweat equity. Perhaps the defendant could get to development faster than it otherwise could have without use of that product. Perhaps it could have spent less money in development than it would have without that product. That's what that cause of action is designed to protect. We're not in the trade secrets realm. We're in common law misappropriation. Now, here's the problem. They never put any expert testimony on. Let me back up. There was nothing in their expert reports or discovery or at trial or in the jury charge on such a measure. So what do they do? They say, oh, my goodness, effectively, we've got no law. What do we do? What do we do? So on the first time on appeal, they say, aha, here's what we'll do. Remember, unfair competition is this general label of law. There is no cause of action for unfair competition. It's a general label or a banner for other things like tortious interference, trademark infringement, common law misappropriation, those sorts of things that each have their own unique elements for the cause of action and their own unique remedy that goes with it. Could you just maybe jump to because the unfair competition bleeds into the preemption. What about the finding as to fraud that is untouched before us? Okay. Why wouldn't he have a remedy in terms of actual damages there for the retooling and the repairs that there was evidence in the record for? Sure. So it goes back to I want to tie this together. Okay. So now we're in a situation where he's trying to claim harm from Mr. Wilford no longer buying product, right? Okay. So let me correct one thing and I'll segue to this. The measure of damages is net profits, period. There's not one case in the Texas Fifth Circuit that he'll cite to you where gross profits is the measure. It's monumentally different. Disgorgement is not a measure? No. No, no. Now, if you want to talk about a breach of fiduciary duty in those instances, you will find some measure. But remember, this unjust enrichment, disgorging the theory, that's not even a measure they're arguing for fraud. Because remember, unfair competition, they're saying we're taking his profits for sales that they would have made to other people. On fraud, the measure is what's the harm that ThermoTech no longer experiences for sales Mr. Wilford is no longer buying from them. Okay? So it's purely a profits measure. It's not an unjust enrichment on the fraud. So on the fraud, you've got just pure, flat-O, Texas law, net profits. So, Judge Smith, you ask, gross profit? There's not a case for gross profits in the Texas law or the Fifth Circuit. You have to look at the entirety of the business, okay? Because here's the thing. Think of it this way. Companies experience lost profits, not products. So that's why you have all the revenues, you have less cost of goods sold, and all these fixed expenses you ask about, because it's lost profits of the business. That's why his net profits argument on a per-product analysis is just contrary to law. Now, Judge Higginson, directly to your point, that illustrates the problem. Perhaps you could have a scenario in a case where you would say, well, their increased expenses are effectively the damage. But it has to be in a framework of what Texas law requires on the lost profits of the business. You have to put on evidence of the revenues of the company, the expenses of cost of goods sold, and then all the other things and see how it comes out in the wash. You can't just say, here are the expenses. Now, they cite a case that seems to suggest that you could do that, but we don't know what all the evidence was in that case. Here, they have to go through that analysis. So, for example, let's say I have $500,000 in revenues, $250,000 in cost of goods sold, or just expenses, and then I have $250,000 left in profit. Well, depending on what all the – and that's on a per-product basis. But what if I look at all my other revenues and my other expenses? I could be negative. You don't know until someone puts on a true measure of damages that goes through all the financial facets of the business, not just plucking out on a one product. Because all the other things may – No one tried to quantify the costs limited just to retooling and repairing the items? No, they did do that. But what I'm saying is that it's not sufficient outside a full net profits analysis because there may be other aspects of the business, depending on what other profits and expenses are, that on a business macro basis for the business, come up with a different number. So that's why the law requires lost net profits analysis, not looking at just a product. That's why I'm saying there's no record before you with this macro complete analysis on that. So Judge Fitzwater was absolutely right when he said you didn't do a full net profits analysis for the business. Don't just look at it at the product level. That's the problem with that. Now let me address fraud very quickly. On fraud damages, again, what they're trying to say is Mr. Wilford somehow didn't – Here was their theory of trial. Mr. Wilford never intended to buy this product. He was going to cheat them out of it. He just wanted to get their information so he could take the product. Now their damages theory on fraud is, well, Mr. Wilford, he didn't keep buying the product. So it's a logical disconnect. That's what Judge Fitzwater recognized. It's too speculative from that standpoint because you're saying, well, he never intended to. That's your fraud theory. But my measure is he should have kept buying for five more years in the face of a contract that was terminable at will on 30 days' notice. And you say, well, how long should you project it out for? I don't know. How about from the time the contract ended to the time we get to trial? Why that period? Because we get to trial. What if we went to trial a year later? Okay, it ought to be six. There's no rhyme. They're making it up. It's not reasonable certainty. Your time has expired, but if you have anything else to say that's not repetitious, you can have the same two minutes that I gave Mr. Spaulding. But if you made your argument, you don't need to do that. Okay, I'll say something new, Your Honor, very quickly, and that is that on the unfair competition measure, it's not just that there's no law to support it. Even if you were to say, okay, this panel is going to be the first ever to say unjust enrichment is okay for a common law of misappropriation because you would be the first. If you were to say that, it's still not appropriate under their own theory because those cases that in a trade secret area where you can have unjust enrichment because there could be a partial destruction of the secret or you could have a total destruction of the secret, those areas where the trade secrets are different, you could have that situation there. But in those scenarios, even when the courts allow it in a trade secret context, they first say the plaintiff must show his inability to prove his own lost profits before we'll even consider letting you use the defendant's profits as a proxy or taking the defendant's profits. There's no showing in the record on that issue that they could not choose their own lost profits and therefore get ours. But even if you get beyond that, they then apply their own gross profit number to our revenues. So here's another problem. There's mixed methodologies. They're taking their gross profit figure, applying it to our revenues. You have to have a single complete analysis. So there's so many problems with this. And that's why Judge Spitzwater's opinion looks like it's rolling logs. Here's a log. Here's a log. Here's a log. One after another, there's just no cognizable way they ever proved sufficient damages under Texas law. Frankly, they want to try this like a trade secrets case. They dismissed their trade secrets case voluntarily. But now they're trying to make it a trade secrets case when it's not, and they dismissed it. There's no reasonable certainty, legally sufficient evidence on any measure of damages in this case. All right. Thank you, Mr. Cook. Mr. Spaulding, you've saved time for a vote. Thank you, Your Honor. Real briefly on the preemption and the waiver issue. At pages 35 to 36 of our brief, that's where we address things that go beyond items that are reduced to writing. So we do mention it, and we have mentioned it. This is not the first time that this is being brought up. We'd always sued for unfair competition. When we originally filed the claim in Texas state court against them, we sued them for unfair competition. So they had the opportunity from day one to raise their preemption argument, and they never did. They've never pleaded. They still have never pleaded. One thing that's overlooked, I think, in the preemption argument is preemption is their affirmative defense. It's their burden of proof. It was not our burden of proof to prove what was not included within the scope of Copyright Act or Patent Act preemption or protection. There's a record statement, which you may remember, that Thermo Tech does not argue that any of its misappropriated information falls outside of the scope of copyright. We had not made that. I don't recall making that argument. The argument I recall making at either the hearing on the JMOL or in our response to their JMOL motion was that they hadn't met their burden of proof to prove that everything fell within the scope of copyright or patent or protection. So you weren't pointing to items that you were saying they hadn't proven it. That's correct. Getting to the damages. So our damage theory was always the same. It was labeled as disgorgement, but it has always been. It had always been and always was and stayed that way at trial, focused on the misappropriated profits that were earned by Wilford and his entities on our stolen product. So the theory never changed. In our expert, Mr. Wise, I had a trial, admitted that it was probably a bad term to use, disgorgement. Now, I'm not necessarily, and as a practical matter, many of the entities, and this was also part of the problem throughout this trial is Mr. Wilford was constantly moving things around and there were entities that were created that were selling these products that were not within the jurisdiction of the court. So Wilford was here. The measure that we chose to prove our damages was the profits that were earned by his entities that were selling our copied units and selling our copied wraps. Those, in that measure, there's no, I haven't found any case law in the common law misappropriation context that delineates exactly what, or limits the items of damage that are recoverable under a common law misappropriation unfair competition claim. Like Mr. Cook said, these fall within a larger umbrella of unfair competition. And the Wellogics case, the Southwest Energy out of the Texas Supreme Court, these are cases that deal with misappropriation. Now, they do deal with misappropriation of trade secrets, but there's nothing that differentiates between the trade secret context or just the common law misappropriation context. Under either scenario, the unfair competition cause of action exists, and it exists for a reason. It exists to prevent someone from using someone else's product in direct competition with them. And in U.S. Sporting Goods, the Waco Court of Appeals case, where the Texas Court of Appeals recognized that in addition to injunctive relief, you're also entitled to money damages, you don't want to turn this into purely a business decision on the part of the bad actor. And that's exactly what happened in this case. Mr. Wilford was able to turn this into what turned out to be a great business decision. He earned millions and millions of dollars selling our copied product, and he got away with it. We'd ask this court to reverse the district court's decision and reinstate the jury verdict in Thermotech's favor. Thank you. All right. Thank you, Mr. Spaulding. Your case is under submission.